UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

SUSAN WOLOTKA,                    )
                                  )
            Plaintiff             )
                                  )
      v.                          )   Case No. 2:02 cv 410
                                  )
SCHOOL TOWN OF MUNSTER,           )
                                  )
            Defendant             )

OPINION AND ORDER

This matter is before the court on the Motion for Summary Judgment filed by the defendant, the School Town of Munster, on June 30, 2005; the Motion to Strike filed by Munster on August 18, 2005; and the Motion to Strike filed by the plaintiff, Susan Wolotka, on August 29, 2005.  For the reasons set forth below, the Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**, the Motion to Strike filed by the defendant is **GRANTED IN PART** and **DENIED IN PART**, and the Motion to Strike filed by the plaintiff is **GRANTED.**

Background

The admissible evidence is as follows.  The plaintiff, Susan Wolotka, began working as a substitute bus driver for the defendant, the School Town of Munster ("Munster"), in 1989.  (Susan Wolotka Dep. p. 15) On November 2, 1992, Wolotka became a full-time ("regular") driver.  (Wolotka Dep. pp. 15-16) As a regular driver, she worked under a yearly contract which was issued in October of each year.  (Wolotka Dep. pp. 16-17) She also became responsible for training new drivers in 1992.  (Wolotka Aff. ∂2) Her immediate supervisor was the Director of Pupil Services,

Martin Keil.  (Keil Dep. p. 21) Richard Sopko, the Assistant
Director of Finance, supervised Keil and the classified employees
which included bus drivers.  (Richard Sopko Dep. p. 10)  It is
undisputed that Wolotka was a good driver.  (Keil Dep. p. 105)

   All bus routes are generally the same in that they have a
combined high school/middle school route and an elementary school
route.  (Keil Dep. p. 47) Some routes also serve St. Thomas More,
a parochial school.  (Jennifer Sapyta Dep. p. 14) The routes that
did not go to St. Thomas were favored by the drivers because they
had a layover, or a period of time where the driver was paid but
not working.  (Keil Dep. p. 66; Sapyta Dep. p. 14) Keil typically
paid bus drivers for 6.0 hours worked daily, which equaled two
hours for the morning and afternoon routes plus 1.75 hours for
the kindergarten route and .25 hours for inspecting, cleaning,
and fueling.  (Keil Dep. p. 46) However, Keil would make allow-
ances for routes which took longer.  (Keil Dep. p. 47) For
example, he would pay a bus driver for 15 more minutes of work if
she was coming in at 4:30 P.M. rather than 4:00 P.M. or 4:10 P.M.
like most bus drivers.  (Keil Dep. p. 47)

   From 1996 to February 2002, Wolotka drove Bus 20 which was
named for the route (20) that she drove.  (Wolotka Dep. pp. 22-
23) In 1996, Wolotka was paid for seven hours a day because her
morning route entailed two high school runs and required her to
make her first stop at 6:45 A.M. instead of 7:00 A.M. (Wolotka
Supp. Aff. ∂3) During the 1997-98, 1998-99, and 1999-2000 school
years, Wolotka was compensated for 6.75 hours of work for the

same route because she had only one high school run in the
morning. (Wolotka Supp. Aff. ∂4; Wolotka Dep. pp. 23, 25) Thus,
with the exception of 15 minutes additional pay in 1996 for the
extra high school run, Wolotka's route from 1996-2000 involved
morning and afternoon high school/middle school runs, a St.
Thomas More route, an elementary route, and a mid-day kindergar-
ten route for which she was compensated a total of 6.75 hours.
She was able to complete her routes in the time allotted.[1]
(Wolotka Dep. p. 25)

At least by the 1995-96 school year, paragraph three in
Wolotka's contracts with Munster provided:

> Employer agrees to pay Driver for his/her
> services under this contract in the amount of
> [rate] per hour for an average [number] hour
> day for 180 days during said school year,
> such sum referred to above to be paid bi-
> weekly. Should the driver work more or less
> than his/her average day pursuant to the
> schedule established by the Employer, Driver
> shall be paid at his/her hourly rate for the
> fraction of the day worked.
>
> *See, e.g.,* Pl. Exh. A, C

According to Keil, bus drivers should record the amount of
time actually worked on their time cards. (Keil Dep. p. 44) He
testified that Munster added paragraph three to the driver
contracts so that drivers would not claim the full day for
partial days worked. (Keil Dep. p. 43) To him, paragraph three

---

[1] Although Wolotka states that her routes and hours compensation did not
change from 1997 to the 2001-02 school year, she was contracted for 7.5 hours
in 2000-01. (Pl. Exh. II) Neither party explains the 45 minute increase,
although Keil suggests in his deposition that the 7.5 reflected additional
shuttles. (Keil Dep. pp. 42, 45)

meant that Munster would pay bus drivers for what they actually
any given day.  (Keil Dep. p. 43) However, more pay only would be
given in "extreme circumstances" such as "heavy snow fall or
significant delays with trains," although he also stated that
drivers would be "paid for what they worked under any circum-
stance."  (Keil Dep. pp. 43, 52) Sopko similarly stated that
drivers were expected to complete their routes in the allotted
time, but they would be paid for additional work if, occasion-
ally, the route took longer to complete.  (Sopko Dep. p. 21)

When Munster issued Wolotka's contract for the 2001-02
school year at the end of October 2001, her hours were reduced
from 6.75 to 6.0, but her routes remained the same.  (Wolotka
Dep. pp. 17, 25, 129) Nevertheless, she was paid for 6.75 hours
during the first two weeks of the school year.  (Wolotka Dep. p.
29)

Prior to signing her contract in early November 2001,
Wolotka brought the reduced hours to Keil's attention.  (Wolotka
Dep. p. 26) During that conversation, Keil claimed that Wolotka
was padding the bill and had been paid for more than she actually
did.  (Wolotka Dep. p. 27) Nevertheless, based on the language in
paragraph three of the contract and Keil's statement at the end
of their conversation that "We'll pay you for what you work,"
Wolotka signed her contract.  (Wolotka Dep. p. 28) However, when
Wolotka received her next paycheck, her hours worked were crossed
out and marked at 6.0 hours per day.  When Wolotka subsequently

spoke to Keil about the change, Keil reiterated that she was over-stating her time.  (Wolotka Dep. p. 30)

Sopko stated that an appropriate way to investigate a charge of timecard padding would be by putting another driver on the disputed route to see how long it took.  (Sopko Dep. p. 46) Keil would ride with other bus drivers, but he refused to ride with Wolotka to see how long it took to drive Route 20 or to reduce the size of the route.  (Keil Dep. pp. 53-54; Sapyta Dep. p. 37; Wolotka Dep. pp. 31, 128) According to Wolotka, Keil said that changes to her route would "inconvenience other drivers." (Wolotka Aff. ∂10) Keil stated that he knew how long the routes were because he developed them, subbed for some of the routes and "may" have driven Wolotka's once or twice, although Wolotka said he never subbed for her.  (Keil Dep. p. 55; Wolotka Dep. p. 31) Keil testified that he probably would have ridden with Wolotka if she had asked, but he also said that he determined that it was not necessary to ride with her because he already knew what time she was coming in every day from daily emails she wrote.  (Keil Dep. pp. 54, 63) According to Keil, if he had ridden with Wolot-ka,

> [i]t would be one of those days where things went smoothly.  And lo and behold, she got in on a good time . . . she would have made it look better to satisfy me on that particular day.  And geez, the traffic was light. Things went smoothly and I'm home free.
>
> (Keil Dep. p. 64)

Also according to Keil, he had lost trust in anything Wolotka said or wrote because it was "clear" to him that she was padding her time because she was upset about not getting the time allotted for her route in previous years and because she had not gotten duties she could have been assigned.  (Keil Dep. pp. 64-65) He further based his conclusion that she was padding her time on the testimony of "other drivers," although the only driver he could recall with certainty subbing for Wolotka was Ann Vermuelen.  (Keil Dep. pp. 48, 55, 67) Keil continued to cross out Wolotka's actual hours worked and write "6.0" on her time card until she changed routes in February 2002.  (Wolotka Dep. p. 32, Pl. Exh. G)

Vermuelen subbed for Wolotka for one week in October 2001 during which she drove only the morning and afternoon routes and did not drive the kindergarten route.  (Keil Dep. pp. 58-61; Wolotka Dep. pp. 130-33; Pl. Exh. I) On her time sheet for that week, Vermuelen recorded 2.5 hours for the morning route and 2 hours for the afternoon.  However, someone reduced Vermuelen's time sheet daily totals to 4.25.  (Pl. Exh. I) Keil has no personal knowledge of the time Vermuelen spent on the morning route, but he did observe Vermuelen coming in one day at 4:08 P.M. from Wolotka's afternoon route.  (Keil Dep. pp. 59, 62) When Wolotka returned to work the following week, she received complaints from parents that Vermuelen let all of the children get off in two stops.  (Wolotka Dep. p. 132)

In order to show Keil how she spent her work time, Wolotka emailed Keil daily reports, specific to the minute, between November 2001 and February 2002.  (Wolotka Dep. p. 31; Pl. Exh. W) Because she drove a kindergarten route, she was permitted to take her bus home.  (Wolotka Supp. Aff. ∂7) She began her day on average at 6:39 A.M. and her total average pre-trip time equaled 20.5 minutes, representing 16.7 minutes[2] to complete her pre-trip inspection and required pre-trip form and 3.8 minutes[3] to drive to the bus lineup.  During the pre-trip inspection, Wolotka checked tires, breaks, lights, potential leaks, and so forth. (Wolotka Supp. Aff. ∂6; Brad Turner Dep. p. 27) Excluding this inspection, her daily morning route averaged 1 hour and 55 minutes.[4]  Wolotka returned to the bus garage at approximately 4:18 P.M.[5] each afternoon following a route that took on average

_____

[2] The court arrived at this number by adding up the minutes in the emails in Plaintiff's Exhibit W.  Specifically, the court totaled 1)the time between the first time entry for each day, which generally was when Wolotka started her bus, and the time Wolotka left for Elliot, plus 2) the time between when Wolotka arrived at Elliot and the time she left Elliot.  The court then divided the total number of minutes, 751, by the number of days, 45.  The court excluded calculations for November 1 and 20, 2001; January 8, 11, 18, and 25, 2001; and February 5 and 12, 2002, because these entries were nonstandard.  All subsequent calculations exclude these dates.

[3] This number represents the average number of minutes between the time Wolotka left for and arrived at Elliot, as outlined in Plaintiff's Exhibit W. It is not clear from Exhibit W whether Wolotka was traveling from her home or from the bus garage.

[4] This calculation reflects the average length of time between Wolotka's departure from Elliot school and last time entry for her morning trip.

[5] In addition to the days mentioned in note 2, *supra*, this average also excludes November 26, 2001, December 5, 2001, and January 30, 2002 because these school days were nonstandard.

7

2 hours and 3 minutes.[6]  Wolotka then completed a 15 minutes post-trip inspection which involved checking the bus for children and forgotten items, refueling, and sweeping.  Drivers had been paid for their post-trip time prior to when the pre-trip form was instituted.  (Wolotka Supp. Aff. ∂6) Wolotka typically sought compensation for 2.5 to 2.75 hours for her total morning and 2.25 to 2.50 for her total afternoon.  (Pl. Exh. E) The 1.75 hours Munster reimbursed Wolotka for the daily kindergarten route is not in dispute.

    According to Keil, Wolotka was coming in "far earlier" than she needed to by arriving up to 20 minutes before her first route and she was unnecessarily waiting 20 minutes later at the end of the school day.  She also had built a break into her morning by going home during her morning route.  In addition, Keil found that Wolotka inappropriately was seeking reimbursement for the 10-12 minutes he said she spent driving the bus from her house to the morning bus line-up.

    On November 14, 2001, Keil emailed a proposed new schedule for Wolotka's morning route that had her coming to work 15 minutes before her first route and that omitted the mid-morning break she took at her house, for which Keil said he would not pay her.  (Keil Dep. pp. 56-57; Pl. Exh. F) He also told her that her afternoon bus checks should take less than a minute rather than five minutes each and that she would not be paid for the time she

---

[6] This calculation reflects the average time spent between Wolotka's departure on the afternoon route and final time entry for the afternoon, which usually was Wolotka's departure from the garage.

spent driving the bus from her home to the morning bus line-up.
(Keil Dep. p. 57; Pl. Exh. F) Keil reiterated his position in a
memo to Wolotka on December 3, 2001, in which he further stated
that substitute drivers were "able to get back in the bus garage
around 4:10, which is consistent with some but not all of the
drivers." (Pl. Exh. H)

Wolotka admits that she counted the time it took her to
drive from home to the morning bus lineup, but she says that the
8 minute drive took less time than was required to navigate the
bus from the bus garage to the lineup due to vehicle congestion
at the school and the fact that Wolotka's bus was the first in
the lineup. (Wolotka Supp. Aff. ∂7) Wolotka told Keil that the
time he called her morning break, which averaged 9 minutes, was
necessary to cross the railroad tracks. (Keil Dep. p. 56)

According to Wolotka, Keil removed a shuttle (an additional
paid route) from Wolotka's 2000-01 schedule and gave it to bus
driver Richard Kaminsky in 2001-02. (Wolotka Dep. p. 37) Keil
told her, "If you can't do the shuttle in 15 minutes, I'm releas-
ing you from it, we're taking it from you." (Wolotka Dep. p. 37)
When the shuttle was added to Kaminsky's route, he was allotted
30 minutes to complete it. (Kaminsky Dep. pp. 13-14)

Kaminsky was paid 2 1/4 hours for his morning route and 2
hours for his afternoon route. He testified that five children
had been added to his route but that he never ran over his
allotted time. (Kaminsky Dep. pp. 16, 22) He estimated that he
and the other bus drivers actually drove for only 1.5 or 1.75

9

hours in the afternoon.  However, he testified that his route was
reduced in size when he had trouble getting the children to
school on time in the morning.  (Kaminsky Dep. pp. 23-24) Bus
driver Jennifer Sapyta also testified that Keil would give a few
students to another route if a driver complained that the route
was too big.  (Sapyta Dep. p. 37)

According to Kaminsky, paragraph three in the bus driver
contracts meant that he would be paid for the additional time if
his route took longer than the contracted length.  In his exper-
ience, most bus drivers recorded the time allotted under the
contract rather than the time they actually worked.  (Kaminsky
Dep. pp. 16-17) Thus, he would not record less time on his
timecard than what was allotted to him.  (Kaminsky Dep. pp. 17,
24) Kaminsky substituted for Wolotka in the spring of the 2000-01
school year, and he said that he had no problem getting her
afternoon route done in 2 hours.  (Kaminsky Dep. pp. 25-26)

According to Wolotka, driver Brad Turner was not required to
take field trips, but that she was required to.  In addition,
Turner was paid additional time to run a shuttle at the end of
the day, but he still returned to the bus garage before Wolotka
returned from her routes during 2001-02.  Thus, he was being paid
more than Wolotka (the regular route pay plus shuttle pay), for
less actual hours of work.  (Wolotka Dep. pp. 39-40) Like Kamin-
sky, Turner testified that Keil assigned the shuttle to him as
part of his route package.  (Turner Dep. p. 17) He further stated
that he told Keil that he did not want to do field trips when he

10

began his employment with Munster.  (Turner Dep. pp. 18-19) Keil testified that he did not have a problem with Turner because Turner told him he did not want field trips from the beginning, but that Wolotka said that she would do field trips and then declined them.  (Keil Dep. p. 80)

Turner testified that he began charging for his time at 6:45 A.M. because his first route started at 7:05 A.M.  (Turner Dep. pp. 26-27) He agreed with Kaminsky on the interpretation of paragraph three in the bus driver contracts and stated that when he exceeded his contractually allotted time, he was paid for the excess time.  However, he only exceeded his contract a few times a year.  (Turner Dep. pp. 29-30) No one ever questioned when Turner reported additional time on his time card.  (Turner Dep. p. 34) Turner stated that he did not have to cross railroad tracks on his route but that "anything goes" with those routes because drivers could not anticipate when trains would come. (Turner Dep. p. 31) With respect to 2.75 hours for Wolotka's morning route and 2.5 hours for the afternoon, Turner stated that in his opinion, whether this time was excessive would depend on how many times Wolotka had to cross the railroad tracks.  (Turner Dep. pp. 38-39)

Sapyta similarly testified that she would record the time allotted to her, or else the extra time if she worked over the contractually allotted amount.  She estimated that she worked overtime approximately once a month, for which she always was

paid, although the school usually would call to ask her about the overtime.  (Sapyta Dep. pp. 33-34)

Wolotka further alleges that John Cody, a now deceased former bus driver, received seniority credit for his three years as a substitute driver.  (Wolotka Dep. pp. 19-20) Munster bus drivers' rate of pay was based on years of experience as a regular driver.  (Sopko Dep. pp. 18-19; Wolotka Dep. p. 18) In the 2001-02 school year, Wolotka earned $13.03 an hour as a ninth year driver.  (Wolotka Dep. p. 18; Pl. Exh. B) By contrast, substitute drivers were not under contract and were paid a flat $10.86 an hour.  (Wolotka Dep. p. 20; Pl. Exh. B) According to Sopko, Keil did not have the authority to pay a substitute driver on a regular scale, but regular drivers could be given credit for up to three years experience on the pay scale for their work as substitutes.  (Sopko Dep. p. 19) This credit was based on "suc-cessful experience as a bus driver" and was recommended by Keil and approved by Sopko.  (Sopko Dep. pp. 28-29) By contrast, Keil testified that he had discretion to pay substitutes on the regular scale and that he may have done so with Cody.  (Keil Dep. pp. 82-83) Keil refused to give Wolotka credit for her experi-ence.  (Wolotka Supp. Aff. ∂9)

It is undisputed that Wolotka had more children and stops added to her route although the date of these additions is not clear.  (Wolotka Dep. pp. 50, 53) It also is undisputed that her route held one child under the maximum capacity on her bus. (Wolotka Dep. p. 51) However, Wolotka's testimony regarding

12

shuttles is unclear.  It is undisputed that all the shuttles she bid on during 2001-02 went to junior drivers.  (Wolotka Dep. pp. 59-60) However, first she testified that she had all shuttles removed from her schedule in 2001-02, including a shuttle taking St. Thomas More children from Wilbur Wright.  (Wolotka Dep. pp. 59, 150) She subsequently stated that she had extra shuttles assigned to her route during the same year.  (Wolotka Dep. p. 67) Her affidavits do not clarify which year she drove the shuttles. (Wolotka Supp. Aff. ∂5; Aff. ∂9)

Wolotka testified that bus routes and shuttles always are awarded based on seniority.  (Wolotka Dep. pp. 42, 47) This policy was written in Bus Driver Manuals from the 1980s, but it had disappeared from the manuals by the 1990s.  However, Wolotka believed that the policy continued in practice.  (Wolotka Dep. pp. 42-45) According to Wolotka, available routes and shuttles would be posted for drivers to bid on, and then the senior-most driver who bid would get the duty.  (Wolotka Dep. pp. 55-57) Except for the instances in which she was passed over for shuttles and routes in favor of more junior drivers, Wolotka could not recall a junior driver ever being awarded a duty over a senior driver.  (Wolotka Dep. pp. 56-61)

According to Sopko, Keil, Sapyta, and Turner, routes and shuttles were awarded at Keil's discretion rather than by seniority.  (Keil Dep. p. 73; Sapyta Dep. pp. 15-18; Sopko Dep. p. 24; Turner Dep. p. 13) Keil considered the number of hours drivers

worked, the geography of the route, and other factors in deter-
mining who should receive a route.  (Sopko Dep. p. 24)

In February 2002, Wolotka and Sapyta both bid on Route 22,
but Sapyta won the bid.  (Wolotka Dep. p. 46) Route 22 was
considered more favorable to Route 17 and Route 20 because it had
a layover rather than a St. Thomas More route.  (Sapyta Dep. p.
14; Wolotka Supp. Aff. ∂10) At that time, Sapyta was 34 years old
and Wolotka was 45 years old and the most senior driver to bid on
Route 22.  (Sapyta Dep. p. 6; Wolotka Dep. pp. 48, 137) Wolotka
was awarded Route 17 instead, for which she also was the senior
driver who bid.  (Wolotka Dep. p. 47) According to Wolotka, Keil
told her that Sapyta had "comparable seniority" and that he gave
her Route 22 because she was "nice."  (Wolotka Dep. pp. 48, 138)
Keil testified that he gave the route to Sapyta because she was a
"more trusted and cooperative employee."  (Keil Dep. p. 71) He
then gave Route 17 to Wolotka because he "knew she wasn't happy
with her present route, so I thought I'd do something to make her
happy."  (Keil Dep. p. 73)

Immediately after Wolotka began Route 17 in February 2002,
someone urinated on one of the bus seats.  She had the windows of
her van broken, and her family's cars were egged in their drive-
way.  (Wolotka Dep. pp. 70-71) The principal of Frank Hammond
also assigned seats on Wolotka's bus.  (Wolotka Dep. p. 73)
Principals occasionally assigned seats for disciplinary reasons
or in response to parental request, but such assignments were
unusual.  (Kaminsky Dep. p. 20; Sopko Dep. p. 33) Wolotka also

14

was not issued her "intent to return" letter at the beginning of May with the other drivers. (Wolotka Dep. pp. 71-72)

According to Wolotka, field trips also were distributed unequally. (Wolotka Dep. p. 142) Field trips were supposed to be rotated based on seniority. (Sapyta Dep. p. 19; Sopko Dep. p. 27; Wolotka Dep. p. 142) Male drivers, including Kaminsky, could drive field trips every night of the week. By contrast, women only got one or two a week and occasionally did not drive trips for several weeks while the men constantly were driving. (Wolotka Dep. p. 142) Wolotka further stated that the length of her route prevented her from driving field trips. (Wolotka Aff. ∂11)

Sapyta typically was offered five or six field trips a month. (Sapyta Dep. pp. 20-21) Kaminsky said that the number of field trips he was offered depended on the number available each month and could be anywhere between two and ten. (Kaminsky Dep. p. 19) Keil thought that Cody got more field trips because he never turned any down. (Keil Dep. p. 84) According to Sopko, drivers were encouraged to do field trips. (Sopko Dep. p. 27) Keil claimed that a driver's decision not to do field trips reflected negatively in his performance review. (Keil Dep. p. 79) However, Sapyta turned down about one field trip a month, and the fact that Sapyta turned down field trips never reflected negatively on her reviews. (Sapyta Dep. pp. 20-21) Kaminsky also never got a negative review for refusing a field trip which he refused once or twice a month. (Kaminsky Dep. p. 19)

When Wolotka became a regular driver in 1992-93, she began receiving yearly evaluations from Keil. (Wolotka Dep. p. 75) In 1993, Keil gave Wolotka A's (excellent) for all items under the categories for safety, pupil/public relations, reliability/co-operation, and maintenance of bus, with the exception of three B's (acceptable) for attendance, "maneuvers bus skillfully," and "maintains trusting and cooperative relationships with other transport personnel." Keil wrote "Susan, I've been very satis-fied with your work. You are obviously more comfortable with a big bus - a few minor scrapes at first. I need you to bridge the gap with other employees." (Pl. Exh. J) During his deposition, Keil testified that Wolotka was marked down because she was a new driver and "probably missed a number of days" of work. In his deposition, he recalled that she "was isolative and not particu-larly friendly to the other bus drivers." (Keil Dep. p. 23)

During the 1993-94 school year, Wolotka drove her first overnight field trip. The rules regarding field trips had not been explained to her before she left, and more senior drivers had told her that she would be reimbursed for all of her time. When she returned, Keil had taken 8 hours off of her time card and informed Wolotka that she would not be paid to sleep. Wolotka ultimately called the National Labor Relations Board and learned that she should be paid for all of her time, which Keil eventually did. (Wolotka Supp. Aff. ∂1)

In her evaluation that Spring, Keil gave Wolotka an N (needs improvement) in the trusting relationships category because of

16

this disagreement, a B in "maneuvers bus skillfully," and in all
subcategories of bus maintenance.  He wrote, "Susan, I feel that
you need to develop greater trust and cooperation with other
staff members and me."  (Pl. Exh. K) He later testified that
their dispute regarding the overnight field trip caused him to
lose trust in her, but he could not remember if any other drivers
had requested full pay for such trips.  (Keil Dep. p. 24) He also
could not recall who he was referencing in saying that Wolotka
did not get along with "other staff members."  (Keil Dep. p. 25)

Wolotka's 1994-95 evaluation reflected all A's except in the
category of bus maintenance for which she received all B's, a B
in pupil discipline, and an N in the trusting relationships
category.  Keil's comments were all positive and did not refer-
ence or explain the N.  (Pl. Exh. L) During his deposition, Keil
could not recall why he criticized Wolotka's trust or coopera-
tiveness.  (Keil Dep. p. 27)

In October 1995, Wolotka filed a complaint with the EEOC
because mechanics who were assigned field trips received a
mechanic's wage rather than a bus driver's wage.  (Pl. Exh. M)
This complaint ultimately was resolved before the end of the
1995-96 school year by Munster correcting the rate of mechanics'
pay.  (Keil Dep. p. 19; Wolotka Dep. p. 77) Prior to filing this
complaint, Wolotka had asked Keil about assigning a shuttle to a
man.  He responded, "Stop asking questions!  I'm going to get rid
of you - going to fire you."  When she inquired regarding another
additional duty that was not assigned to her, Keil stated, "If

17

you don't like it, get out of here, or I can help you get out."
(Wolotka Supp. Aff. ∂11) In response to an inquiry in one of
Wolotka's emails regarding why some drivers were paid for lay-
overs while others had to work during that time, Keil responded,
"There is one driver who complained; that person is terminating
employment with us.  Also, I don't think the other drivers asso-
ciate seniority with job security."  (Pl. Supp. Aff. ∂11 Attach.
A)

        In her evaluation of May 1996, Keil gave Wolotka all B's, a
B- for attendance, an N for obeying traffic laws, and an N for
maintaining trusting relationships.  He also commented, "you
continue to have problems interacting with other staff members
and me.  We lost a potential substitute driver as a result of
your actions. . . .  I have been responsive to our concerns but
will not tolerate another year of discord."  Keil also threatened
dismissal for Wolotka allowing students to ride forward of the
safety line in the bus.  (Pl. Exh. N)

        According to Keil, the negative evaluation was in part
because comments Wolotka had made resulted in a trainee deciding
not to work at Munster.  (Keil Dep. p. 28) According to Wolotka,
the driver Munster "lost" did not possess an air brakes certifi-
cation and had not been to safety school as required for bus
drivers under Indiana law.  When Wolotka noticed that the driver
was training with students on her bus, Wolotka told her that she
should not be driving students without these requirements ful-

18

filled.  At the time, Wolotka was the trainer for the Transporta-
tion Department.  (Wolotka Supp. Aff. ∂2)

Keil further could not recall why he made the other comments
in Wolotka's 1996 evaluation and admitted that the statements may
have been a reference to Wolotka's EEOC complaint.  (Keil Dep. p.
29) He stated that her filing "didn't make me happy."  (Keil Dep.
p. 30) He further testified that he gave her a bad review because
"her driving got different," which he personally observed through
occasionally following her in his vehicle.  He stated that he
observed Wolotka speeding, using unsafe loading and unloading
procedures, operating bus safety equipment inefficiently, and
operating the bus unskillfully.  He did not know if Wolotka was
aware he was following her.  (Keil Dep. pp. 30-31) In addition,
he could not recall the details of Wolotka speeding except to say
she was going "northbound."  (Keil Dep. p. 32) He also admitted
grading Wolotka down for attendance absences even though he
approved of the absences.  He said that in retrospect, Wolotka
was less cooperative than she had been and was less willing to do
field trips.  (Keil dep. pp. 34-35)

Wolotka's evaluations from the 1996-97 to the 2000-01 school
years were nearly straight A's with a few isolated B's.  (Pl.
Exhs. O-S) According to Keil, the improved ratings were because
Wolotka "changed her behavior" and regained his trust.  (Keil
Dep. pp. 36-38) In May 1997, Keil commented to Wolotka, "You've
handled difficult riders and parents well.  Your rapport with the
entire staff has been very good.  You are a patient and thorough

trainer, too." (Pl. Exh. O) In May 1999, Keil gave Wolotka a few B's and one N because of a "confrontation" she had with one of the school principals.  However, Wolotka's 2000 evaluation again reflected all A's, a B, and a B+, with all positive comments from Keil.  (Pl. Exh. R) In 2001, Wolotka received straight A's with the exception of one B in attendance.  Keil commented, "Susan, thanks for another excellent year.  You have done all tasks in a thorough and professional manner." (Pl. Exh. S)

On February 7, 2002, Wolotka notified Keil that she intended to file a second EEOC complaint.  (Pl. Exh. T) In April 2002, Wolotka filed her second complaint regarding pay for her route and seniority issues.  (Pl. Exh. U) In Wolotka's May 21, 2002 evaluation, Keil gave Wolotka 4 N's in the categories of estab- lishing rapport with parents and staff, attendance, maintaining trusting relationships, and completing correspondence accurately and promptly.  He gave her a B in obeying traffic laws due to a "near accident," a B in availability for assigned extra trips, and a B- in her use of safe loading and unloading procedures.  He further stated:

> Susan, I am not satisfied with major aspects
> of your work.  I do not feel that I can trust
> you to complete your time card in an honest
> fashion.  I feel that you have distorted and
> purposely misinterpreted my directives about
> your time, pay, and duties.. I feel that you
> have attempted to hinder my efforts at train-
> ing new drivers (withdrawing your name as a
> trainer).  I think your relationship with
> other staff members are [sic] inconsistent
> and oftentimes asocial i.e. not attending
> driver meetings, retirement parties, etc.
> Your attendance needs improvement, as does

20

some of your driving habits.  All of these
problems are grounds for dismissal.

(Pl. Exh. V)

At the close of this meeting, Keil stated that he wished for the
immediate termination of Wolotka's employment.  (Pl. Exh. X, p.
2)

Keil had not requested that Wolotka do her job differently,
beyond reducing her hours to 6, prior to this evaluation.
(Wolotka Dep. p. 83) Keil could not recall why he gave Wolotka an
N for parent and staff rapport and further testified that he gave
Wolotka N's for missing work and driver meetings.  (Keil Dep. pp.
92-93, 101) He denied that Wolotka's second EEOC complaint
factored into his decision to fire Wolotka and said that it did
not "appreciably" influence his review of her.  (Keil Dep. p.
110)

According to Wolotka, she only removed her name for training
one person and got Sapyta to cover the training.  She subse-
quently was not assigned any further trainees, and Keil told her
that he did not want her to be a trainer.  (Wolotka Dep. pp. 84-
85) With respect to the "near accident," Wolotka stated that her
bus was at a full stop at a stop sign when a driver took the
corner too broadly and went into the grass.  Other bus drivers
were not terminated for their involvement in accidents.  Wolotka
denied problems with parents and testified that she knew all the
parents and children because Route 20 went through her own
neighborhood.  (Wolotka Dep. pp. 87, 175-76)

21

Regarding Wolotka's attendance grades, she stated that
retirement parties and other social functions were not part of
bus driver duties.  (Keil Dep. p. 88; Wolotka Dep. pp. 84-85)
Kaminsky, for example, only attended employee Christmas parties.
(Kaminsky Dep. p. 21) Wolotka attended every driver meeting
except for one which occurred during her vacation, and she called
following the meeting to see if any changes had been made to her
route.  (Wolotka Dep. pp. 84-85) Kaminsky also missed driver
meetings and Keil never complained about his absences.  (Kaminsky
Dep. p. 25) According to Sapyta, it was not a big deal to miss a
driver meeting, and Keil did not complain when Sapyta missed one
meeting.  (Sapyta Dep. pp. 42-43) Wolotka called in sick only
twice during 2001-02, and all her other absences were pre-ap-
proved.  (Wolotka Dep. pp. 86, 171)

Immediately following her last evaluation, Wolotka wrote to
one of the School Board trustees as well as to Superintendent of
schools and Sopko's supervisor, William Pfiser, recounting the
events of her evaluation and responding to each low grade.
(Wolotka Dep. p. 75; Pl. Exh. X) On May 29, 2002, Pfiser declined
to intervene on Wolotka's behalf and stated that it was inappro-
priate for her to have contacted a trustee.  (Pl. Exh. Y)

Sopko, who was present when Wolotka received her 2002
evaluation, asked Wolotka why she did not just leave.  (Sopko
Dep. p. 44; Wolotka Dep. pp. 68, 74) Sopko had not attended
Wolotka's evaluations prior to May 2002.  (Wolotka Dep. p. 68)
Keil previously had complained to Sopko regarding Wolotka's

22

training other bus drivers because she was moody and never seemed
to have time to conduct the training.  (Sopko Dep. p. 39) Keil
had been unhappy with Wolotka's moodiness for three or four years
prior to her termination.  Approximately two years before her
termination, Sopko overheard Keil tell Wolotka that "but for
advice of counsel I would terminate you now."  (Sopko Dep. p. 41)

On June 7, 2002, Wolotka was fired.  At that time she was
two months and two days away from becoming vested in her pension.
(Wolotka Dep. pp. 4, 49) At Wolotka's termination, Keil repeated
that he would have preferred to terminate her earlier but had
been advised not to by legal counsel.  (Sopko Dep. p. 42) Accord-
ing to Sopko, Keil terminated Wolotka both because of her moodi-
ness and poor interaction with her coworkers and also because she
was padding the payroll.  (Sopko Dep. p. 48) However, Keil was
solely responsible for making the decision to terminate Wolotka.
(Sopko Dep. p. 48) According to Keil, he terminated Wolotka only
for padding her time.  (Keil Dep. pp. 101-02)

Discussion

I.  Defendant's Motion to Strike

The defendant seeks to strike the plaintiff's Statement of
Genuine Issues because, the defendant argues, the Statement does
not comply with Local Rule 56.1.  Rule 56.1(a) requires the
nonmovant to respond to a summary judgment motion with a "'State-
ment of Genuine Issues' setting forth, with appropriate citations
to discovery responses, affidavits, depositions, or other admis-
sible evidence, all material facts as to which it is contended

23

there exists a genuine issue necessary to be litigated."  The court's interpretation of its own local rules is accorded substantial deference.  *See* ***Cichon v. Exelon Generation Company***, 401 F.3d 803, 810 (7th Cir. 2005).

The plaintiff's Statement of Genuine Issues complies with the Local Rule.  Through specific citations to the evidence, the Statement highlights aspects of the plaintiff's case which cast doubt on the defendant's position.  *See* ***Waldridge v. American Hoechst Corporation***, 24 F.3d 918, 923 (7th Cir. 1994) (upholding the trial court's enforcement of Local Rule 56.1 of the Southern District of Indiana, which is substantially the same as the Northern District's rule, when the plaintiff "did not make any effort to identify with specificity what factual issues were disputed, let alone supply the requisite citations to the evidentiary record").

Although the defendant argues that the plaintiff's 18-page statement of issues far exceeds the defendant's four-page statement of facts, the court notes that the defendant's "facts" almost exclusively are the procedural history of the case.  The plaintiff should not be punished for assisting the court in determining the substantive facts under these circumstances, particularly in light of the number of the plaintiff's claims. In any event, Rule 56.1 does not require the Statement of Genuine Issues to mirror the Statement of Material Facts in size or format.

24

Next, the defendant argues that certain statements in Wolotka's affidavits and Statement of Genuine Issues must be stricken. The plaintiff concedes that Wolotka's statement that other drivers had nearly 10 minutes of time to inspect their buses and wait for students is inadmissible. Accordingly, the court strikes this statement from paragraph 5 of Wolotka's Supplemental Affidavit. Wolotka also concedes that evidence she sought counseling following her termination is not necessary to her case at the summary judgment stage. Therefore, the court declines to consider Wolotka's counseling treatments for purposes of summary judgment. The timing of Wolotka's disclosure regarding counseling, which appears to be the crux of the defendant's objection, more appropriately is a subject for a motion in limine.

The statements of Keil and Sopko described in the plaintiff's two affidavits are admissible under the Federal Rules of Evidence. According to Rule 801(d)(2)(D), a statement offered against a party is not hearsay if it is "a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." In employment discrimination cases, "the declarant must be involved in the decision making process affecting the employment action involved," through, for example, serving in management or some other personnel position. *See* ***Aliotta v. Amtrak***, 315 F.3d 756, 762 (7th Cir. 2003). It is undisputed that both Sopko and Keil were directly involved in the decision-making

25

process regarding Wolotka's termination and that all of their statements to which the defendant objects relate directly to her employment situation.  The defendant concedes this point by failing to file a reply brief.

Finally, the defendant argues that "statements" made by John Cody, set forth in Section G of the plaintiff's Statement of Genuine Issues, are inadmissible hearsay because he is deceased. The only statement by Cody referenced in this section was the averment that he was given guaranteed hours and contracts while he was a substitute driver.  The plaintiff has waived any objections to the defendant's motion to strike regarding Cody by failing to respond on this point. *See* ***River v. Commercial Life Insurance Company***, 160 F.3d 1164, 1173 (7th Cir. 1998); ***Riley v. UOP, LLC***, 244 F.Supp.2d 928, 934 n.5 (N.D. Ill. 2003).  Although this statement is stricken from Section G, the court notes that Keil's own statement that he may have paid Cody on a regular scale while Cody was a substitute is admissible.

On a related note, the court excludes from evidence the portions of Wolotka's deposition in which she states that driver Johann McCain told her that Kaminsky was being paid half an hour to complete a shuttle for which Wolotka was paid 15 minutes.  The plaintiff concedes that this statement is inadmissible hearsay in her summary judgment response brief.  (Pl. Response MSJ, p. 20) Once again, however, Kaminsky and Keil's own statements regarding the shuttle are admissible.

26

In sum, the court strikes Wolotka's statement that other
drivers had 10 minutes to inspect their buses, strikes Cody's
statement that he was paid guaranteed hours and contracts as a
substitute, and excludes McCain's alleged statements to Wolotka
from the evidence.  The court also declines to consider Wolotka's
counseling treatments at this stage in the litigation.

### II.  Plaintiff's Motion to Strike
### and Remaining Claims

The briefing on the motion for summary judgment, together
with the relief requested in the plaintiff's motion to strike,
has created a strange posture for the substantive issues in this
case.  The court clarifies the remaining claims here.

Judgment must be granted *instanter* on certain claims and
issues.  Wolotka concedes summary judgment with respect to her
state law claim for wrongful discharge and her claim for gender
harassment under Title VII.  (Pl. Resp. MSJ, p. 2) Additionally,
the only Age Discrimination in Employment Act ("ADEA") claim
Wolotka asserts on summary judgment is that Keil gave Route 22 to
a younger employee.  (Pl. Resp. MSJ, pp. 4-5) Accordingly, the
plaintiff has waived any other arguments under the ADEA and
summary judgment is granted on the Indiana wrongful discharge and
Title VII gender harassment claims.

Wolotka seeks to strike arguments made for the first time in
Munster's reply brief regarding Wolotka's *prima facie* case under
Title VII.  Wolotka clearly asserted claims for both gender
discrimination and gender harassment in Count V of her Third

27

Amended Complaint.  However, Munster only addressed the plain-
tiff's harassment claim in its opening brief on summary judgment.
After Wolotka noted Munster's omission in her response brief,
Munster attempted to challenge Wolotka's *prima facie* case for
gender discrimination in Section C of its reply brief.

It is well settled law in this Circuit that arguments raised
for the first time in a reply brief are waived.  *See* ***River***, 160
F.3d at 1173 (holding that a plaintiff waived an argument known
to him at the time he filed his response in opposition to summary
judgment by failing to raise it in his response brief).  With no
citation to law, Munster attempts to limit this proposition to
appellate briefs.  The law does not support such a narrow con-
struction of this elementary briefing rule, which applies both
when a party fails to raise or to support adequately an argument
in briefing any motion filed at the trial or appellate level.
*See, e.g.,* ***Bell v. Duperrault***, 367 F.3d 703, 709 n.1 (7th Cir.
2004) (noting that failure to raise an argument before the trial
court also waives the argument at the appellate level); ***River***,
160 F.3d at 1173; ***REP MCR Realty, L.L.C. v. Lynch***, 363 F.Supp.2d
984, 1015 (N.D. Ill. 2005) (holding that a plaintiff waives an
argument he fails to raise in opposition to a motion for sanc-
tions); ***Eagle Services Corporation v. H2O Industrial Services,
Inc.***, No. 2:02CV36PRC, 2005 WL 1429279, at *1 (N.D. Ind. June 8,
2005); ***Anderson v. Trans Union, L.L.C.***, 345 F.Supp.2d 963, 975
(W.D. Wis. 2004) ("[F]ailure to develop an argument constitutes
waiver.").

28

Munster's assertion that Wolotka "makes various arguments that Munster did not anticipate and raises various facts that were not revealed in Wolotka's deposition" in the response brief, thereby justifying Munster's arguments in reply, is misplaced. (Resp. to Pl. Mot. to Strike, p. 2) When the nonmovant raises new issues or arguments in response to a summary judgment motion, the movant is entitled to respond to those new issues in its reply brief. *See Central States, Southeast and Southwest Areas Pension Fund v. White*, 258 F.3d 636, 640 n.2 (7th Cir. 2001). However, without any specificity regarding which arguments could not be anticipated and which facts were not revealed, the court will not conclude summarily that Munster is entitled to make new arguments in a reply brief. The court further notes that the *prima facie* case is fundamental to any discrimination suit and that Wolotka's deposition testimony was exceptionally clear on the basis of each of her claims. For these reasons, Section C of the reply brief is stricken.

Wolotka also seeks to strike Munster's argument that Wolotka's Equal Pay Act ("EPA") claims are untimely. In its opening brief, Munster limits its timeliness argument to Wolotka's Title VII harassment claim. (Mem. Supp. MSJ, pp. 11-12) Then, in it reply brief, Munster asserts the same argument for the first time with respect to Wolotka's EPA claims, referencing the pages of the opening brief that address the timeliness of Wolotka's Title VII EEOC filings. (Reply Brief, p. 8) Title VII and the EPA are separate and distinct bases for the plaintiff's claims. As such,

29

Munster needed to challenge clearly the timeliness of Wolotka's claims under both statutes in order to avoid waiver of the issue under the EPA.  Because Munster failed to do so in its opening brief, the last sentence of Section B in the reply brief is stricken.

Before proceeding on the motion to strike, the court must address certain substantive aspects of Wolotka's EPA claims.  The basic premise behind the EPA is that men and women should be paid equally for substantially equal work.  *See* ***Cullen v. Indiana University Board of Trustees***, 338 F.3d 693, 698 (7th Cir. 2003).  In order to establish a *prima facie* case under this statute, the plaintiff must show: "(1) higher wages were paid to a male employee, (2) for equal work requiring substantially similar skill, effort and responsibilities, and (3) the work was performed under similar working conditions."  ***Cullen***, 338 F.3d at 698 (citation omitted).  Even if the plaintiff establishes her *prima facie* case, the employer can avoid liability by presenting evidence the pay differential was based on a "factor other than sex."  29 U.S.C. ß206(d)(1).  *See also* ***County of Washington v. Gunther***, 452 U.S. 161, 167-68, 170, 101 S.Ct. 2242, 2248, 8 L.Ed.2d 751 (1981) (explaining the EPA's affirmative defenses).

The "any other factor" defense is similar to the "legitimate business expectations" and "pretext" elements (which sometimes are analyzed jointly) of a Title VII disparate treatment claim based on indirect proof.  *See* ***Wernsing v. Department of Human Services, State of Illinois***, ___ F.3d ___, 2005 WL 2676755, at

*2-4 (7th Cir. Oct. 21, 2005). *See also Gunther*, 452 U.S. at
170-71, 101 S.Ct. at 2248-49 (noting that the EPA does not apply
to disparate impact claims). However, the EPA and Title VII
analyses differ in two key ways. The EPA, unlike Title VII, does
not require proof of discriminatory intent. *See Cullen*, 338 F.3d
at 698. The defendant's reason for the wage disparity simply
must be "*bona fide*." *See Gunther*, 452 U.S. at 170, 101 S.Ct. at
2248. In addition, the "any other factor" defense is broader
under the EPA than the pretext/legitimate expectations analysis
under the Title VII: "The factor [other than sex] need not be
related to the requirements of the particular position in ques-
tion, nor must it even be business-related." *Wernsing*, 2005 WL
2676755, at *3-4 (citation and quotation omitted) (alteration in
original); *Dey v. Colt Construction & Development Company*, 28
F.3d 1446, 1462 (7th Cir. 1994).

Problematically, three of the plaintiff's EPA claims cannot
be brought under the EPA on their face. Wolotka alleges that:
(1) Kaminsky received 15 more minutes of pay because he was
allowed 30 minutes to complete a shuttle Wolotka was required to
complete in 15 minutes; (2) field trips were distributed un-
equally between male and female drivers; and (3) Cody was given
credit towards retirement for his substitute years, but Wolotka
was not. The first two of these claims involve disparate awards
of work time, not disparate pay for that time. *See Fyfe v. City
of Fort Wayne*, 241 F.3d 597, 600 (7th Cir. 2001) ("It certainly
does not violate the Equal Pay Act to pay an employee additional

31

money for additional work.").  The third claim, for seniority
credit towards retirement, also is not premised on disparity in
wages but rather disparity in the number of years men and women
are required to work before their pensions vest.  Again, this is
not an appropriate claim under the EPA.  *See* **Cullen**, 338 F.3d at
698 (stating that a *prima facie* case requires proof of *wage*
disparity).  Therefore, summary judgment must be granted on these
claims insofar as Wolotka brings them under the EPA.  The claims
survive under Title VII for the reasons set forth below.  (*See*
Pl. Resp. MSJ, p. 25) (alleging gender discrimination under Title
VII on the same facts).

In addition to the three failed claims, Wolotka claims that
three more actions violated the EPA: (4) Turner was paid for more
time with less work than Wolotka; (5) Munster gave Cody credit on
the pay scale for his years as a substitute, but denied her the
same; and (6) Wolotka was not paid for the time she worked in
excess of her contract hours, but male drivers were.  As with the
preceding three claims, these claims survive under Title VII
regardless of the outcome under the EPA.

However, the surviving posture of Wolotka's EPA claims (4)-
(6) is more nuanced.  Wolotka's fourth claim regarding Turner is
not amenable to summary judgment because Munster does not acknow-
ledge it at all.  Therefore, both the plaintiff's satisfaction of
her *prima facie* case and the success of Munster's "any other
factor" defense remain open questions on this claim.  Conversely,
Munster did acknowledge claims (5) and (6) in its opening brief,

32

and so Munster has waived any challenges to the *prima facie* case
on these claims.  Nevertheless, the only argument Munster makes
with respect to claim (5) is that it is based on inadmissible
evidence.  This argument was addressed in part I of this Opinion.
Claim (5) otherwise is not amenable to summary judgment because
the "any other factor" defense has not been briefed adequately
with respect to this claim, and consequently, remains an open
question.  Thus, the only EPA claim fully before the court on
summary judgment is Wolotka's sixth claim for overtime pay, on
which the only issue not waived is whether Munster has a *bona
fide* "any other factor" defense.  Because both parties assert the
same arguments for this EPA defense as they do under the legiti-
mate expectations/pretext analysis applicable to Title VII and
the ADEA, the court considers this issue under all statutory
frameworks jointly in the Discussion part of this Opinion.

To summarize, summary judgment is granted in favor of the
defendant on the following claims: (1) Indiana wrongful dis-
charge; (2) Title VII gender harassment; and (3) Wolotka's claims
under the EPA regarding a) Kaminsky being allowed 30 minutes to
complete Wolotka's formerly 15 minute shuttle, b) field trip
distribution, and c) credit towards retirement for years as a
substitute driver.  Wolotka waives all claims under the ADEA
except that Keil awarded Route 22 to a younger person, and
Munster waives any challenge to the timeliness of Wolotka's EPA
claims.  In addition, the court strikes Section C, paragraphs 2,

3, and 4 from Section B, and the last sentence of Section B from the defendant's reply brief.

Following these rulings, all six of the claims Wolotka asserts under both the EPA and Title VII survive a *prima facie* case under Title VII because this issue has been waived. Wolotka's EPA claim regarding Turner is not amenable to summary judgment in any respect. Munster waives any challenge to the plaintiff's *prima facie* case for the other two EPA claims: 1) the denial of pay scale credit for Wolotka's years as a substitute; and 2) the denial of overtime pay claim on which the only issue is whether Munster's "any other factor" defense is *bona fide*.

Wolotka asserts claims under the ADEA, EPA, Title VII gender discrimination, and Title VII retaliation. However, the only discrete issues amenable to summary judgment in this case are whether: (1) Wolotka suffered an adverse employment action under the ADEA; (2) Wolotka was meeting her employer's legitimate job expectations under the ADEA and Title VII; (3) whether Munster's claim that Wolotka was padding her time card is a *bona fide* reason based on any factor other than sex under the EPA or a legitimate nondiscriminatory reason under Title VII and the ADEA not to pay Wolotka for hours worked in excess of her contract; and (4) whether Munster unlawfully retaliated against Wolotka. The parties agree that consideration of legitimate job expectations and pretext/the "any other factor" defense should be considered together in this case because they are intertwined. *See **Jones v. Union Pacific Railroad Company**,* 302 F.3d 735, 742

34

(7th Cir. 2002); *Nwanna v. Ashcroft*, 66 Fed. Appx. 9, 13 (7th Cir. 2002); *Coco v. Elmwood Care, Inc.*, 128 F.3d 1177, 1179 (7th Cir. 1997).  Therefore, the court combines issues two and three for the purposes of summary judgment.

### IV.  Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is proper only if it is demonstrated that "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 91 L.Ed.2d 265, 106 S.Ct. 2548 (1986); *Lawrence v. Kenosha County*, 391 F.3d 837, 841 (7th Cir. 2004); *Branham v. Snow*, 392 F.3d 896, 901 (7th Cir. 2004); *Windle v. City of Marion, Indiana*, 321 F.3d 658, 660-61 (7th Cir. 2003), *cert. denied*, 540 U.S. 873, 124 S.Ct. 873, 157 L.Ed.2d 133 (2003).  The burden is upon the moving party to establish that no material facts are in genuine dispute, and any doubt as to the existence of a genuine issue must be resolved against the moving party.  *Adickes v. S.H. Kress & Company*, 398 U.S. 144, 160, 90 S.Ct. 1598, 1610, 26 L.Ed.2d 142, 155 (1970); *Lawrence*, 391 F.3d at 841. A fact is material if it is outcome determinative under applicable law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 212 (1986); *Lawrence*, 391 F.3d at 841; *Hottenroth v. Village of Slinger*, 388 F.3d 1015, 1027 (7th Cir. 2004); *Palmer v. Marion County*, 327 F.3d 588, 592 (7th Cir. 2003).  Even if the facts are not in dispute, summary judgment is inappropriate when the information before the court

35

reveals a good faith dispute as to inferences to be drawn from those facts. *Spiegula v. Hull*, 371 F.3d 928, 935 (7th Cir. 2004); *Hines v. British Steel Corporation*, 907 F.2d 726, 728 (7th Cir. 1990). Finally, summary judgment "will not be defeated simply because motive or intent are involved." *Roger v. Yellow Freight Systems, Inc.*, 21 F.3d 146, 148 (7th Cir. 1994). *See also Miller v. Borden, Inc.*, 168 F.3d 308, 312 (7th Cir. 1999); *Plair v. E.J. Brach & Sons, Inc.*, 105 F.3d 343, 346 (7th Cir. 1997); *United Association of Black Landscapers v. City of Milwaukee*, 916 F.2d 1261, 1268 (7th Cir. 1990).

In deciding a motion for summary judgment, the trial court must determine whether the evidence presented by the party opposed to the summary judgment is such that a reasonable jury might find in favor of that party after a trial.

> The inquiry performed is the threshold inquiry of determining whether there is the need for a trial--whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.
>
> [T]his standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict.
>
> *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202, 212 (1986)

*See also, Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149-151, 120 S.Ct. 2097, 2109, 147 L.Ed.2d 105, 120-22

(2000) (setting out the standard for a directed verdict); *Celotex Corp.*, 477 U.S. at 322-323, 106 S.Ct. at 2553; *Branham*, 392 F.3d at 901; *Lawrence*, 391 F.3d at 841; *Hottenroth*, 388 F.3d at 1027 (stating that a genuine issue is one on which "a reasonable fact finder could find for the nonmoving party"); *Schuster v. Lucent Technologies, Inc.*, 327 F.3d 569, 573 (7th Cir. 2003) (stating that a genuine issue exists and summary judgment is inappropriate if there is sufficient evidence for a jury to return a verdict for the nonmoving party).

The first claim before the court is that Munster discrimi-nated against Wolotka on the basis of her age when Keil awarded Route 22 to Sapyta.  The ADEA states:

> It shall be unlawful for an employer to fail or refuse to hire or to discharge any indivi-dual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employ-ment, because of such individual's age.
>
> 29 U.S.C. ß623(a)(1)

A claim under the ADEA is successful if the plaintiff can show that his "termination or other adverse employment action would not have occurred 'but for' [his] employer's motive to discriminate on the basis of [his] age." *Fuka v. Thomson Con-sumer Electronics*, 82 F.3d 1397, 1402 (7th Cir. 1996); *Horwitz v. Board of Education of Avoca School District No. 37*, 260 F.3d 602, 610 (7th Cir. 2001); *Baron v. City of Highland Park*, 195 F.3d 333, 338 (7th Cir. 1999).  A plaintiff may prove discrimination by direct evidence of discriminatory intent or where no direct

37

evidence exists, by using the indirect burden-shifting method established in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802-05, 93 S.Ct. 1817, 1824-25, 36 L.Ed.2d 668 (1973), and refined in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1092, 67 L.Ed.2d 207 (1981). *See Reeves*, 530 U.S. at 142, 120 S.Ct. at 2105; *Cerutti v. BASF Corporation*, 349 F.3d 1055, 1060-61 (7th Cir. 2003); *Franzoni v. Hartmarx Corporation*, 300 F.3d 767, 771 (7th Cir. 2002); *Horwitz*, 260 F.3d at 610.  Here, Wolotka proceeds only under the indirect method of proof.

Under *McDonnell Douglas*, the plaintiff must establish a *prima facie* case by showing that: (1) she is over 40 years of age; (2) she performed her job satisfactorily and in accordance with the defendant's legitimate expectations; (3) she suffered an adverse employment action; and (4) a younger employee, who is similarly situated, was treated more favorably.  *Olson v. North-ern FS, Inc.*, 387 F.3d 632, 635 (7th Cir. 2004); *Franzoni*, 300 F.3d at 771-72; *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 885-86 (7th Cir. 2001).

Once the plaintiff establishes a *prima facie* case, a pre-sumption of discrimination is created and the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for its employment actions.  *Gusewelle v. City of Wood River*, 374 F.3d 569, 574 (7th Cir. 2004); *Zaccagnini v. Charles Levy Circulating Company*, 338 F.3d 672, 675 (7th Cir. 2003); *Grayson v. City of Chicago*, 317 F.3d 745, 748 (7th Cir. 2003).

38

The defendant's burden is not one of persuasion, but rather of
production and "can involve no credibility assessments." *St.
Mary's Honor Center v. Hicks*, 509 U.S. 502, 509, 113 S.Ct. 2742,
2748, 125 L.Ed.2d 407 (1993); *Reeves*, 530 U.S. at 142, 120 S.Ct.
at 2106.  The burden then shifts back to the plaintiff who must
now show by a preponderance of the evidence that the defendant's
reasons are merely a pretext for discrimination.  *Steinhauer v.
Degolier*, 359 F.3d 481, 484 (7th Cir. 2004); *Volvosek v. Wiscon-
sin Department of Agriculture, Trade and Consumer Protection*, 344
F.3d 680, 692 (7th Cir. 2003).  The trier of fact may consider
the evidence establishing a plaintiff's *prima facie* case and
inferences properly drawn therefrom on the issue of whether a
defendant's explanation is pretextual.  *Reeves*, 530 U.S. at 143,
120 S.Ct. at 2106.

The ultimate burden of persuasion remains at all times with
the plaintiff.  *St. Mary's Honor Center*, 509 U.S. at 507, 113
S.Ct. at 2747; *Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094; *Butts
v. Aurora Healthcare*, 387 F.3d 921, 924 (7th Cir. 2004).  A
plaintiff alleging discrimination, however, has a lesser burden
when proceeding on a summary judgment motion.  In *Anderson v.
Baxter Healthcare Corp.*, 13 F.3d 1120 (7th Cir. 1994), the Sev-
enth Circuit stated:

> Both *McDonnell Douglas* and [*St. Mary's Honor
> Center v. Hicks*, 509 U.S. t 507, 113 S.Ct. at
> 2747] speak to the burden the plaintiff bears
> at trial.  However, for summary judgment
> purposes, the nonmoving party, in this case
> the plaintiff, has a lesser burden.  He must
> only "produce evidence from which a rational

> fact-finder could infer that the company
> lied" about its proffered reasons for dismis-
> sal.
>
> 13 F.3d at 1124 (*quoting* **Shager v. Upjohn**,
> 913 F.2d 398, 401 (7th Cir. 1994)

*See also* **Zaccagnini**, 338 F.3d at 676 (The plaintiff may avoid summary judgment by showing specific facts that place the employer's explanation in doubt); **O'Neal v. City of New Albany**, 293 F.3d 998, 1005 (7th Cir. 2002); **Alexander v. Wisconsin Department of Health and Family Services**, 263 F.3d 673, 683 (7th Cir. 2001). If the plaintiff is unable to meet his burden, his claims must fail.

The parties do not dispute that Wolotka was over age 40 or that Sapyta was a younger employee who was similarly situated but treated more favorably than Wolotka.  Therefore, the only disputed aspects of Wolotka's *prima facie* case are whether Wolotka suffered an adverse employment action and whether she was performing her job satisfactorily.  *See* **Campbell v. Dwyer Products Corporation**, 31 Fed. Appx. 916, 918-19 (7th Cir. 2002) (addressing only those elements of the *prima facie* case in dispute).

The Seventh Circuit broadly defines "adverse employment action" to include both apparent terminations, reductions in pay or benefits, and other nonmonetary forms of adversity.  *See* **Farrell v. Butler University**, 421 F.3d 609, 613-14 (7th Cir. 2005); **Oest v. Illinois Department of Corrections**, 240 F.3d 605, 612-13 (7th Cir. 2001).  However, "the definition of an adverse employment action . . . is still subject to certain limitations."

40

*Johnson v. Cambridge Industries, Inc.*, 325 F.3d 892, 901 (7th Cir. 2003), *cert. denied*, 540 U.S. 1004, 124 S.Ct. 535, 157 L.Ed.2d 409 (2003).  One such limitation is that the action taken be *materially* adverse or "more than a mere inconvenience or an alteration of job responsibilities." *Bio v. Federal Express Corporation*, No. 1:03-cv-101-LJM-WTL, 2004 WL 1689362, at *7 (S.D. Ind. June 22, 2004), *aff'd* 424 F.3d 593 (7th Cir. 2005).

At a minimum, the plaintiff "must show some quantitative or qualitative *change* in the terms or conditions of his employment that is more than a mere subjective preference" in order to establish that she has suffered an adverse employment action. *Johnson*, 325 F.3d at 901 (emphasis added).  *See also Traylor v. Brown*, 295 F.3d 783, 788 (7th Cir. 2002) (*quoting Haugerud v. Amery School District*, 259 F.3d 678, 692 (7th Cir. 2001)) ("[A]n employee must show that 'material harm has resulted from . . . the challenged actions.'").  For example, an employer's refusal to allow a woman to perform certain duties that her male coworkers performed was not an adverse employment action when the woman was not "terminated, demoted, or disciplined, . . . her pay [was] unaffected, and her job responsibilities [were] not materially diminished," and the men did not receive any additional promotions, pay, or prestige for performing the extra duties.  *See Traylor*, 295 F.3d at 789.  Similarly, a teacher who carried a higher teaching load than some of her coworkers has not suffered an adverse employment action when "the load was no different from what many other professors in the department had to carry." *Yan*

41

*v. Board of Regents of the University of Wisconsin System*, No. 05-C-16-C, 2005 WL 2206768, at *14 (W.D. Wis. Sept. 12, 2005). *See also* **Bledsoe v. Potter**, No. 03 C 3890, 2005 WL 2230188, at *9-10 (N.D. Ill. Sept. 7, 2005) ("[A] change in schedule, without more, does not constitute an adverse action under applicable precedent."). Simply put, "not everything that makes an employee unhappy is an actionable adverse action." **Smart v. Ball State University**, 89 F.3d 437, 441 (7th Cir. 1996).

Wolotka's ADEA claim fails because Keil's decision to award Sapyta with Route 22 does not rise to the level of an adverse employment action. The only difference between Route 22 and Route 20, which Wolotka had driven for approximately five years, was that Route 22 had a layover rather than a St. Thomas More route. It is undisputed that Munster paid drivers for the St. Thomas More layover time period regardless of which format their work schedule followed. There is no evidence that drivers with the layover received higher pay, more prestige, or any other benefit whatsoever beyond one hour in which they were paid but were not required to drive. Wolotka was no different in this respect than her coworkers whose workdays also included a St. Thomas More route. In sum, Keil's decision to award Route 22 to Sapyta caused no change in Wolotka's then-existing conditions of employment. Route 22 "was not a promise that was taken away. It was a possibility that did not materialize." **Yan**, 2005 WL 2206768, at *14. Because Wolotka cannot establish that she suffered an adverse employment action, her ADEA claim fails as a

42

matter of law.  The court need not reach the remaining elements
of Wolotka's *prima facie* case or the **McDonnell Douglas** analysis
on this claim.

Wolotka has offered only indirect evidence for her Title VII
sex-based wage discrimination claims, so the **McDonnell Douglas**
analysis must be applied.  Although Munster does not mention
Title VII gender discrimination in its opening brief, the pretext
analysis is precisely the same as that for the ADEA, which
Wolotka does address.  It also overlaps with the critical issue
in the EPA "any other factor" defense: whether Munster's allega-
tion that Wolotka was padding her time is *bona fide*.  The court
will not exalt form over substance; to proceed otherwise could
lead to a ruling on summary judgment that is inconsistent with
the jury's verdict at trial.  As previously determined, the court
considers the issue of legitimate expectations and pretext
together.  *See* **Jones**, 302 F.3d at 742.

The only basis on which Keil refused to pay Wolotka for her
time in excess of the contractual amount, and subsequently fired
her, was that she allegedly was padding her time.  (Keil Dep. pp.
101-02) Although Sopko also suggested that Wolotka's interaction
with her coworkers was a basis for her termination, Keil was the
final decision-maker.  Thus, his stated reason for acting is the
only relevant one.  *See* **Rogers v. City of Chicago**, 320 F.3d 748,
754 (7th Cir. 2003); *Accord,* **Ezell v. Potter**, 400 F.3d 1041,
1050-51 (7th Cir. 2005) (noting that the employer does not escape
liability even when the final decision-maker's motive was inno-

43

cent when that person relied on the opinion of a supervisor who
was motivated by gender animus).

In order to establish pretext, Wolotka "must produce 'signi-
ficantly probative admissible evidence' from which the trier of
fact could infer that the employer's reason was false *and* that
the actual reason was discriminatory." *Jones*, 302 F.3d at 742-43
(emphasis in original) (citation omitted).  According to the
Seventh Circuit, proof that Munster's decision was pretextual

> requires more than showing that the decision
> was "mistaken, ill considered or foolish
> [and] so long as [the employer] honestly
> believes those reasons, pretext has not been
> shown." *Jordan v. Summers*, 205 F.3d 337, 343
> (7th Cir. 2000).  Pretext "means a dishonest
> explanation, a lie rather than an oddity or
> an error." *Kulumani v. Blue Cross Blue*
> *Shield Association*, 224 F.3d 681, 685 (7th
> Cir. 2000)
>
> *Ballance v. City of Springfield*, ___ F.3d
> ___, 2005 WL 2271911, at *2 (7th Cir. Sept.
> 19, 2005)

Thus, "the actual issue is not whether [Munster's] account of
events is correct, rather it is whether [Munster] honestly
believed" that Wolotka was padding her time.  *Jones*, 302 F.3d at
744 (*citing* *Kariotis v. Navistar International Transportation*
*Corporation*, 131 F.3d 672, 677 (7th Cir. 1997)) ("[A]rguing about
the accuracy of the employer's assessment is a distraction . . .
because the question is not whether the employer's reasons for a
decision are *right* but whether the employer's description of its
reasons is *honest*.") (quotations omitted).  *See also* *Gordon,* 246
F.3d at 889 (noting that even if the employer's reasons for

discharge were "foolish or trivial or even baseless," summary judgment is inappropriate if the reasons were honestly believed).

Wolotka has produced sufficient evidence to create an issue of material fact regarding whether Keil honestly believed Wolotka was padding her time. Wolotka was paid for 6.75 hours to drive the same route for five years preceding the events of 2001-02. Keil could not recall with certainty independently driving Wolotka's route, did not ride with Wolotka when she drove, and would not reduce the size of her route, although he rode with other drivers and reduced the size of Kaminsky's route when Kaminsky had trouble completing the route on time.

The only objective evidence on which Keil relied to determine Wolotka was padding her time was Vermuelen's time card from the week she substituted for Wolotka, his personal observation that Vermuelen came in one afternoon at 4:08 P.M., and the daily emails Wolotka sent to Keil. However, Vermuelen also recorded time in excess of the hours Keil believed Wolotka's routes should take. Like Wolotka, Vermuelen's recorded time was crossed out and reduced. Keil further testified that he had no personal knowledge of how long Vermuelen actually took to drive Wolotka's morning route. In addition, Wolotka came in at 4:18 P.M. on average every day from her afternoon route, which is only 10 minutes later than Vermuelen. Wolotka's unrebutted statement that she received complaints that Vermuelen dropped all the students off in two stops could account for the time difference.

45

Moreover, Wolotka's morning route took on average 1 hour 55 minutes and her afternoon route took an average of 2 hours and 3 minutes.  Although Keil claimed Wolotka was starting earlier than she needed to, her daily emails show that she began work on average 21 minutes before her first stop.  Kaminsky testified that he began billing 20 minutes before his first stop as well. Even if Wolotka omitted the approximately 9 minute break she took at her house in the morning, her route still would take an average of 1 hour and 46 minutes, which is on the high end of Kaminsky's estimation that most routes took 1.5 to 1.75 hours. Wolotka's 2 hour and 3 minute afternoon route, which Keil did not challenge in any respect, is fully beyond Kaminsky's estimation. These calculations are based on the daily emails from Wolotka to Keil.

Summary judgment also cannot be granted because divergent inferences can be drawn from the evidence regarding the appropriate method of billing, which is fundamental to Wolotka's claim that she was underpaid.  Keil testified that he paid drivers 2 hours for each morning and afternoon route plus 15 minutes for the pre-trip inspection, cleaning, and fueling.  Wolotka's unrebutted supplemental affidavit states that drivers were paid for their post-trip time before the instigation of the pre-trip inspection and paperwork.  Her personal emails show that she routinely sought payment for 15 minutes of post-trip time, which she stated involved refueling and sweeping.  (Pl. Exh. W) Her statements are not inconsistent with the other bus drivers'

46

testimony: if another driver's route took only 1.5 to 1.75 hours
to complete but the driver was recording his time as the full 2
hours allotted under his contract, then Keil would not know if
that driver actually was spending an additional .25 hours in
post-trip work.

Conversely, a review of Wolotka's emails shows that she
typically added 15 minutes of post-trip time to both her morning
and afternoon routes and that she calculated her time in strict
15 minute intervals.  (Pl. Exh. W) Therefore, if she worked from
2:00 P.M. until 4:15 P.M., she recorded 2.25 hours of driving
time plus .25 hours for post-trip work.  But if she worked from
2:00 P.M. until 4:16 P.M., she recorded 2.5 hours of driving time
plus .25 hours for post-trip work.  Therefore, she sometimes
sought pay for up to 29 minutes after she returned from both her
morning and afternoon routes, or 58 additional minutes a day.
This method of calculation may in fact be evidence of padding.
However, there is no evidence pertaining to the correct billing
increments or contradicting Wolotka's affidavit regarding post-
trip time, and Wolotka was explicit about her addition of post-
trip time in her emails.  In any event, Keil's persistent reduc-
tion of Wolotka's timecard to six hours per day over multiple
months raises an inference of discrimination by itself, as other
drivers exceeded their time several times a month and were paid
for the excess.

Because genuine issues of material fact exist with respect
to whether Munster's stated reason for refusing Wolotka overtime

pay and for firing her is pretextual or *"bona fide"* in the
context of the EPA, summary judgment must be denied on Wolotka's
Title VII sex discrimination and EPA wage-discrimination claims.

The final claim is that Keil retaliated against Wolotka for
complaining to the EEOC.  To present a *prima facie* case for
discriminatory retaliation, Wolotka must prove that "(1) she
engaged in statutorily protected expression; (2) she suffered an
adverse employment action; and (3) there was a causal link
between the protected expression and the adverse action."  ***Culver
v. Gorman & Company***, 416 F.3d 540, 545 (7th Cir. 2005); ***Moser v.
Indiana Department of Corrections***, 406 F.3d 395, 403 (7th Cir.
2005).  The only element of the *prima facie* case the parties
dispute is whether there is a causal link between Wolotka notify-
ing Keil on February 7, 2002 and subsequently filing her April 2,
2002 EEOC complaint and her termination two months later on June
7, 2002.  Wolotka proceeds under both the direct and indirect
methods of proof.

Just as with other discrimination claims, the direct method
of proof in a retaliation claim "can be supported with direct or
with circumstantial evidence." ***Culver***, 416 F.3d at 545.  Direct
evidence essentially requires an outright admission by the
decision-maker that he based his decision on a discriminatory
animus.  *See* ***Culver***, 416 F.3d at 545; ***Blise v. Antaramian***, 409
F.3d 861, 866 (7th Cir. 2005); ***Jordan v. City of Gary, Indiana***,
396 F.3d 825, 832 (7th Cir. 2005).  Wolotka does not rely on
direct evidence relating to her 2002 EEOC complaint, but rather

48

relies on circumstantial evidence to show retaliation under the
direct method of proof.

A "convincing mosaic" of circumstantial evidence from which
the trier of fact could infer intentional discrimination will
directly prove the plaintiff's *prima facie* case.  *See **Culver**, 416
F.3d at 545-46; **Jordan**, 396 F.3d at 832.  However, the circum-
stantial evidence "must point directly to a discriminatory reason
for the employer's action." **Jordan**, 396 F.3d at 832.  According
to the Seventh Circuit, "*mere* temporal proximity between the
filing of the charge of discrimination and the action alleged to
have been taken in retaliation for that filing will rarely be
sufficient to create a triable issue" under the direct method of
proof.  *See **Stone v. City of Indianapolis Public Utilities
Division**, 281 F.3d 640, 644 (7th Cir. 2002) (emphasis added).
However, suspicious timing coupled with suddenly poor performance
evaluations or selective enforcement of work rules is enough to
directly establish a *prima facie* case of retaliation.  *See
**Culver**, 416 F.3d at 546-47; **Lang v. Illinois Department of
Children and Family Services**, 361 F.3d 416, 420 (7th Cir. 2003);
**Bart v. Telford**, 677 F.2d 622, 625 (7th Cir. 1982).

Wolotka received two performance reviews from Keil that were
substantially worse than all of her other evaluations, both of
which followed on the heels of her EEOC complaints.  In 1993,
Keil gave Wolotka all A's, an A+, and three B's for her first
year as a regular driver.  Her two subsequent evaluations were
all A's and a few B's, with an N in trusting relationships.

49

However, Keil admitted that the N in 1994 was related to the
dispute regarding overnight pay on field trips which Wolotka had
brought to the attention of the NLRB, and he could not recall why
he gave Wolotka an N in 1995.

Following Wolotka's first complaint to the EEOC in October
1995, Keil gave Wolotka straight B's, a B-, and 2 N's on her
evaluation in the Spring of that school year, his comments were
overwhelmingly negative, and he threatened to fire her.  He
admitted that this poor evaluation could have been related to
Wolotka's EEOC complaint.  Subsequently, the only explanation
Keil gave for Wolotka's next four years of nearly perfect evalua-
tions was that Wolotka had changed her behavior and regained his
trust.  But once again, two months after Wolotka told Keil she
was filing her second complaint, Keil gave Wolotka 4 N's, 2 B's,
a B-, heavily criticized her work, and threatened to fire her in
his 2001-02 evaluation.  Keil claimed that some of these low
grades were for absences, missing driver meetings, and failure to
participate in social activities with coworkers.  However, it is
undisputed that Wolotka's absences were pre-approved and that
Kaminsky was not criticized for missing driver meetings and did
not attend any social events except the annual Christmas party.
Finally, Keil repeatedly threatened to fire Wolotka when she
asked him questions about work assignments, twice told her that
he would fire her "but for advice of counsel," and ultimately did
fire her allegedly for padding her time.  Taken together, this

evidence raises a triable inference of unlawful retaliation under
the direct method of proof.[7]

Because Wolotka has met her *prima facie* case through direct
evidence,

> the burden of production shifts to the defen-
> dant to prove by a preponderance of the evi-
> dence that the same action would have oc-
> curred in the absence of the protected con-
> duct.  The persuasiveness of the defendant's
> explanation is normally for the finder of
> fact to assess, unless the court can say
> without reservation that a reasonable finder
> of fact would be compelled to credit the
> employer's case on this point.  Summary judg-
> ment should be granted only if the defendant
> presents unrebutted evidence that he would
> have taken the adverse employment action
> against the plaintiff even if he had no re-
> taliatory motive. (internal citations and
> quotations omitted)
>
> *Culver*, 416 F.3d at 546

Munster argues that no retaliation occurred because Wolotka would
have been terminated anyway for padding her time.  This argument
brings the court back to its analysis, *supra*, on the merits of
this defense.  Because the court previously concluded that
genuine issues of material fact pertaining to Munster's proffered
reason for terminating Wolotka prevent the court from granting
summary judgment on Wolotka's gender and wage discrimination
claims, the court declines to do so on Wolotka's retaliation
claim as well.  The court further notes that although it is

---

[7] While the plaintiff also argues that someone urinating in her bus,
breaking the windows in her van, and egging her family's personal vehicles is
direct evidence of discrimination, the plaintiff has failed to link these
actions to the defendant.  Therefore, these events are irrelevant to this
case.

unnecessary to consider retaliation under the indirect method of proof, the defendant would fare no better under *McDonnell Douglas.*

_____

For the foregoing reasons, the Motion for Summary Judgment filed by the defendant, The School Town of Munster, on June 30, 2005 is **GRANTED IN PART** and **DENIED IN PART**, the Motion to Strike filed by Munster on August 18, 2005 is **GRANTED IN PART** and **DENIED IN PART**, and the Motion to Strike filed by the plaintiff, Susan Wolotka, on August 29, 2005 is **GRANTED.**

The following claims remain in this case:

(1)  all six claims of Title VII gender discrimination;

(2)  Title VII retaliation;

(3)  the EPA claim that Turner was paid more for less work;

(4)  the EPA claim that Wolotka was denied pay scale credit for her years as a substitute, but only on the issue of Munster's "any other factor" defense; and

(5)  the EPA claim that Wolotka was denied overtime pay, but only on the issue of Munster's "any other factor" defense.

ENTERED this 7th day of November, 2005

s/ ANDREW P. RODOVICH
    United States Magistrate Judge

52